## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **BENJAMIN COLE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 15-CV-0049-GKF-CDL** |
| | ) | |
| **JIM FARRIS, Warden,** | ) | |
| **Oklahoma State Penitentiary,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION AND ORDER

Petitioner Benjamin Cole, an Oklahoma prisoner presently incarcerated at the Oklahoma State Penitentiary (OSP), in McAlester, Oklahoma, is scheduled to be executed by the State of Oklahoma on October 20, 2022, at 10:00 a.m.  This matter is before the Court on Cole's 28 U.S.C. § 2254 petition for writ of habeas corpus filed January 30, 2015 (Dkt. 2), Cole's 28 U.S.C. § 2254 supplemental petition for writ of habeas corpus filed October 18, 2022 (Dkt. 62), and Cole's emergency motion for stay of execution filed October 18, 2022 (Dkt. 63).  Cole asserts that because he presently is incompetent to be executed, his execution will violate the Eighth and Fourteenth Amendments, as interpreted in *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Panetti v. Quarterman*, 551 U.S. 930 (2007).  Dkt. 2.  He further asserts that Oklahoma's statutory and administrative procedures violate the Eighth and Fourteenth Amendments because they are not adequate to ensure that incompetent prisoners, like Cole, will not be executed.  Respondent filed a response in opposition to the petition on February 13, 2015 (Dkt. 6), a response in opposition to the supplemental petition on October 19, 2022 (Dkt. 64) and a response in opposition to the emergency motion to stay on October 19, 2022 (Dkt. 66).  Cole filed replies to both responses the same day (Dkts. 69, 70).

For the following reasons, the Court DENIES the original and supplemental petitions for writ of habeas corpus and DENIES as moot Cole's emergency motion for stay of execution.

## I.     Background

### A.     Underlying facts

Nearly two decades ago, on December 20, 2022, Cole brutally murdered his nine-month-old daughter, Brianna Cole. *Cole v. State*, 164 P.3d 1089, 1092-93 (Okla. Crim. App. 2007). As described by the Oklahoma Court of Criminal Appeals (OCCA), the state medical examiner determined that "Brianna's spine had been snapped in half, and her aorta had been completely torn through due to non-accidental stretching. The official cause of death was described as a fracture of the spine with aortic laceration." *Cole*, 164 P.3d at 1092. Cole "eventually admitted causing the fatal injuries." *Id.* In a statement to law enforcement, Cole explained that "he'd been trying, unsuccessfully, to get [Brianna], who was lying on her stomach, to stop crying. [Cole] eventually grabbed [Brianna] by the ankles and pushed her legs toward her head until she flipped over. This action broke [Brianna's] back and resulted in fatal injuries." *Id.* Cole's case ultimately proceeded to a jury trial in the District Court of Rogers County, Case No. CF-2002-597, and, in October 2004, the jury found Cole guilty of first-degree child abuse murder, found the existence of two aggravating circumstances, and sentenced him to death. *Id.* In 2007, the OCCA affirmed Cole's conviction and sentence on direct appeal. *Id.* at 1102. The United States Supreme Court (Supreme Court) denied Cole's petition for writ of certiorari. *Cole v. Oklahoma*, 553 U.S. 1055 (2008).

### B.     History of challenges to Cole's competence

On two occasions before his trial, Cole's attorneys questioned whether Cole was competent to stand trial. First, in July 2003, Cole's attorney, Silas Lyman, informed the trial court that he and co-counsel, John Dalton, "had several occasions, numerous occasions, over the period of time

since [they] were appointed to represent Mr. Cole, to confer with him, to discuss his case, to advise

him of matters in the case, and it has progressively gotten worse, as far as, in our opinion, [Cole's]

ability to assist us and to understand what we're talking about." Dkt. 2-15, at 1-3.[1]  The trial court

stayed the case and ordered a mental health evaluation.  Dkt. 2-15, at 4-5; Dkt. 2-16.  In August

2003, following an evaluation by Dr. Samina Christopher, Cole's attorneys stipulated that Cole

was competent to stand trial.  Dkt. 2-17, at 1-3.  Second, in July 2004, Cole's attorneys filed a

written application for determination of competency.  Dkt. 2-18.  The trial court ordered that Cole

undergo a second mental health evaluation and, later, scheduled a jury trial on the competency

issue for September 13, 2004.  Dkt. 2-19.  During opening statements of the competency trial,

Cole's attorney, Jim Bowen, argued that Cole was "not mentally ill" or "delusional" but instead

was "in such a state of religious fervor" that he could not "rationally assist his attorneys" in making

critical decisions regarding his defense.  Dkt. 2-18, at 1; Dkt. 2-20, at 3.  Following a two-day trial,

the jury found that Cole was competent to stand trial.  Dkt. 6, at 1.

Cole did not raise any competency issues on direct appeal in the OCCA.  He did, however,

raise those issues in an application for postconviction relief.  In its order denying post-conviction

relief, the OCCA performed a merits review of Cole's competency claim when it denied his claim

that appellate counsel was ineffective for failing to raise the competency issue on direct appeal[2]

and found as follows:

> Accordingly, we find, first, that his claim has been waived, as it certainly could
> have been raised on direct appeal. Secondly, we find that, to the extent that the
> claim was raised on direct appeal. . . , it was rejected and is res judicata. Third, we
> find that, to the extent that any of the claim survives, it fails. Both a jury of
> Petitioner's peers and health professionals found he was competent to stand trial,
> and the fact that appellate counsel may not have directly raised this claim on appeal

---

[1] The Court's citations refer to the CM/ECF header pagination.

[2] The OCCA looks to the merits of the omitted issue when it determines appellate counsel effectiveness. *Hooks v. State*, 902 P.2d 1120, 1123 (Okla. Crim. App. 1995).

would not on this record amount to ineffective assistance.  While Petitioner's extreme religious views may be difficult to appreciate to the common man and may have led to some decisions that few would make, we are not prepared to say counsels' decision to forego review of this claim – that Petitioner's religious beliefs rendered him incompetent – was ineffective, or for that matter even wrong, based upon this record.  Nor do the exhibits attached to the post conviction application convince us that an evidentiary hearing is needed on this issue.

*See Cole v. Workman*, 2011 WL 3862143, at *8 (N.D. Okla. 2011) (unpublished)[3] (quoting *Cole*

*v. State*, Opinion Denying Application for Post Conviction Relief at 4, Case No. PCD-2005-23).

On May 15, 2009, Cole filed his first federal petition for writ of habeas corpus in N.D.

Okla. Case No. 08-CV-328-CVE-PJC.  Cole's attorney for that habeas proceeding, Kenneth Lee,

provides an affidavit (Dkt. 2-34), describing his interactions with Cole over a five-year period.

Lee states that:

> As part of our representation of Mr. Cole, we retained Dr. Raphael Morris to conduct an evaluation.  The evaluation was conducted over a period of several hours on December 15, 2008.  Part of Dr. Morris's evaluation included observing my attempts to communicate with Mr. Cole and Mr. Cole's reaction.  Based on these observations and the results of efforts to test Mr. Cole, Dr. Morris concluded Mr. Cole suffers from paranoid schizophrenia, with grandiose delusions.  Mr. Cole's mental illness manifests itself, among other things, in his hyper-religiosity.  Dr. Morris concluded that as [a] result of his mental illness, Mr. Cole is unable to rationally assist his attorneys.
>
> . . .
>
> After Dr. Morris's evaluation [on December 15, 2008], Mr. Cole began to isolate himself further.  This was particularly troubling since Mr. Cole never left his cell to go to the yard or to go shower.  By the end of December 2008 and continuing into the following years, Mr. Cole began refusing meeting with members of his team.
>
> The investigators, the other attorneys, and I continued to try to meet with Mr. Cole. I believe I met with him a total of three times in 2009, for a total of about two hours.  After 2009, a distinct pattern developed.  If Mr. Cole came out to meet with any of the team, he would refuse to sit down, or would sit for only a few minutes.  Mr. Cole was emaciated, and hair and beard were long and somewhat unkempt.  Most of our meetings were very brief lasting less than five minutes.  During these rare

---

[3] The Court cites unpublished decisions in this opinion either for their historical or persuasive value.  *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

occurrences, Mr. Cole barely spoke, and appeared distracted and disheveled -- in that he did not seem to understand what was being said to him, and could only focus on the one thing he needed (i.e., obtaining a "Jew bag," or an indigent bag). In addition, he spoke softly and mumbled when he spoke.

. . .

During the five years I represented Mr. Cole, I was never able to have a substantive conversation with him about his case, the death of his daughter, his personal history, or any other relevant topic. He has never been engaged at all about his case, and he never assisted us in the legal proceedings. This was entirely frustrating. After reviewing all of the information we could find about Mr. Cole and his case, I believe he wanted us to continue with the defense he gave his trial attorneys -- that unto God all things are possible. *See* Matthew 19:26 (KJV).

Over the course of five years, Mr. Cole's condition has deteriorated significantly. Initially, he could write letters with full sentences. As Mr. Cole began to decompensate, his letters disintegrated into abrupt, incomplete notes on scraps of paper, usually asking for spare change and wanting us to pick up papers that were never left for us.

Dkt. 2-34, at 2-3. In Cole's first habeas corpus action, United States District Judge Claire V. Eagan denied relief on fourteen claims, including Cole's claims that he was incompetent to stand trial and to assist in his appeal. *Cole*, 2011 WL 3862143. Cole appealed, and the United States Court of Appeals for the Tenth Circuit (Tenth Circuit) denied relief. *Cole v. Trammell*, 755 F.3d 1142 (10th Cir. 2014). The Supreme Court denied certiorari review. *Cole v. Trammell*, 135 S. Ct. 224 (2014).

Cole, appearing through counsel, commenced the instant habeas action in January 2015, claiming that he was incompetent to be executed and that his execution, then scheduled to take place in March 2015, would have violated the Eighth and Fourteenth Amendments, as interpreted in *Ford* and *Panetti*. Dkt. 2, at 1, 38-43. On January 28, 2015, the Supreme Court stayed Cole's execution pending final disposition of a case challenging Oklahoma's lethal injection protocol. Dkt. 11, at 1. On July 8, 2015, following disposition of the case challenging the injection protocol, the OCCA rescheduled Cole's execution date for October 7, 2015. *Id.* Also on July 8, 2015, this

5

Court issued an order finding that Cole failed to exhaust available state remedies as to his *Ford*

claim and ordered this matter stayed while Cole pursued that claim through a mandamus action in

Pittsburg County District Court (hereafter, "the 2015 mandamus action").[4]  *Id.* at 8.

The record provided by Cole reflects that on August 28, 2015, an evidentiary hearing was

conducted in Pittsburg County District Court, Case No. CV-2015-58.  Dkt. 13-1.  On September

8, 2015, Pittsburg County District Judge James Bland entered a written order denying Cole's

petition for writ of mandamus, finding that the OSP's former warden, Anita Trammell, did not

abuse her discretion in refusing to initiate proceedings pursuant to Okla. Stat. tit. 22, § 1005.  Dkt.

13-2.

Cole then filed a petition for writ of mandamus in the OCCA.  Dkt. 14-1.  In an order filed

October 2, 2015, the OCCA denied Cole's petition for writ of mandamus.  *Cole v. Trammell*, 358

P.3d 932 (Okla. Crim. App. 2015).  Citing *Ford* and *Panetti*, the OCCA concluded that the state

---

[4] The Tenth Circuit recognizes that mandamus provides a state judicial remedy for an Oklahoma prisoner challenging his competence to be executed.  *See Ochoa v. Trammell*, 504 F. App'x 705, 709 (10th Cir. 2012) (unpublished) (citing *Allen v. Workman*, 500 F. App'x 708, 710-12 (10th Cir. 2012) (unpublished)).  Under Oklahoma law, if a defendant's competency to be executed is properly called into question, the issue is presented to a jury.  The governing statute provides as follows:

> If, after his delivery to the warden for execution, there is good reason to believe that a defendant under judgment of death has become insane, the warden must call such fact to the attention of the district attorney of the county in which the prison is situated, whose duty is to immediately file in the district or superior court of such county a petition stating the conviction and judgment and the fact that the defendant is believed to be insane and asking that the question of his sanity be inquired into. Thereupon, the court must at once cause to be summoned and impaneled from the regular jury list a jury of twelve persons to hear such inquiry.

Okla. Stat. tit. 22, § 1005.  When the warden communicates his or her opinion that the defendant is competent to be executed, the defendant may file a petition for writ of mandamus in Pittsburg County District Court requesting the court to direct the warden to act.  In addition, should the state district court deny mandamus relief, the defendant may file a mandamus appeal in the OCCA.  The OCCA then independently determines the existence of "good reason to believe" that the defendant has become insane.

district court did not abuse its discretion when it found that Cole did not meet his burden to show

"that [Trammell] had refused to carry out a legal duty" to initiate competency proceedings because

Cole did not make a "substantial threshold showing of insanity." *Cole*, 358 P.3d at 939.   The

OCCA reasoned, in relevant part,

> that the trial court's determination that Petitioner had not met his burden of a substantial threshold showing of insanity was not clearly against the logic and effect of the facts presented.  It is clear from the record that Petitioner was aware of the nature of the proceedings against him, what he was tried for, the purpose of his punishment, and his impending fate.  Respondent, [Investigator] Gardner, and Dr. Morris all agreed on this fact.  (Evid. Hrg. Tr. 57, 144-51, 225).  Petitioner verified this circumstance with his testimony at the hearing.  (Evid. Hrg. Tr. 25-26).

> Even though Petitioner has shown minor signs of mental illness, the record reveals that Petitioner's mental state is not so distorted by delusions or mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole.  Petitioner's lengthy conversations with Respondent exhibit the mental state requisite for competence to be executed.

> Citing to the testimony of Dr. Morris, Petitioner argues that his understanding is not rational because of certain delusions.  However, Morris failed to relate any definitive delusions to the Court but, instead, admitted that Petitioner's fervent religious statements were similar to those held by other members of organized religion.  (Evid. Hrg. Tr. 167-70, 185, 221-22).  Thus, we find that Petitioner has not overcome the presumption of sanity.

> . . .

> Petitioner further cites to Gardner's allegation that Petitioner stated that God made him kill his daughter as part of a prophecy.  However, we find that the District Court did not abuse its discretion when it failed to put any weight in Gardner's testimony.  Gardner admitted that she had no understanding of Petitioner's religious beliefs and could not follow his line of thought.  (Evid. Hrg. Tr. 64).  She had not communicated any of Petitioner's alleged statements to Respondent.  Gardner had never made an affidavit in the case and had not revealed any of her thoughts to the prison staff.  (Evid. Hrg. Tr. 65, 68).  None of the other witnesses shared Gardner's opinions.

> Petitioner's conversations with Respondent about religion and his quotations of scripture were not radical.  (Evid. Hrg. Tr. 136).  Petitioner had never informed Respondent that there was any other reason for his execution other than the fact that he had murdered his daughter.  (Evid. Hrg. Tr. 146).  As there is no credible evidence in the record which connects Petitioner's fervent religious statement with

a lack of understanding of his crime and punishment as shared by the community as a whole, we find that the District Court did not abuse its discretion.

Considering the record in its entirety, we find that there is not a reasonable probability that Petitioner lacks the competency to be executed. As such, we conclude that Respondent did not have a clear legal duty to act under § 1005. Accordingly, Petitioner's Petition for Writ of Mandamus is DENIED.

*Cole*, 358 P.3d at 939-41 (footnotes omitted).

On October 2, 2015, the OCCA also issued an order indefinitely staying Cole's execution date for reasons unrelated to his alleged incompetency. Dkt. 18, at 1. Based on the indefinite stay of his execution date, this Court determined that Cole's *Ford* claim, as asserted in his original petition, was not ripe and, on November 24, 2015, ordered this matter administratively closed. Dkt. 31.

### C.    Recent developments

On February 17, 2022, this Court granted Cole's request to reopen this matter and reinstate his original petition, finding that Cole's execution date could no longer be described as indefinite. Dkt. 38. In May 2022, Cole's counsel contacted Farris, the OSP's current warden, and provided Farris with updated materials relevant to Cole's competency to be executed, including "2016, 2018, and 2022 reports from psychologist Dr. George Hough, Ph.D., ABPP, detailing Mr. Cole's severe mental illness, decompensated mental condition, and incompetency for execution, and a 2022 report from neuroradiologist Dr. Travis Snyder, D.O., regarding Mr. Cole's abnormal MRI and brain lesion." Dkt. 62, at 15; Dkt. 62-10, at 4-6. Cole's counsel requested that Farris initiate proceedings under Okla. Stat. tit. 22, § 1005. Dkt. 62, at 15.

On June 13, 2022, this Court granted the parties' joint request for a court-ordered mental health evaluation under terms agreed upon by the parties. Dkt. 54. Per the parties' agreed upon terms, Cole was transported to the Oklahoma Forensic Center and evaluated by the Center's chosen forensic examiner, Scott Orth, Psy. D., a forensic psychologist, on July 5, 2022. Dkts. 54, 57; Dkt.

62, at 15-16.  Dr. Orth submitted his report to the Court on July 14, 2022, opining that Cole is competent to be executed.  Dkt. 57; Dkt. 62, at 16.

Meanwhile, on July 1, 2022, the OCCA granted the State's request to set execution dates for several death-row inmates and established October 20, 2022, as Cole's execution date.  Dkt. 62, at 7.  Cole's counsel contacted Farris again on August 1, 2022, and provided Farris with Dr. Hough's declaration critiquing Dr. Orth's evaluation and report.  Dkt. 62, at 16; Dkt. 62-10, at 8.  The next day, Farris advised Cole's counsel that he would not initiate proceedings under § 1005.  Dkt. 62-10, at 9.

On August 15, 2022, Cole thus initiated a mandamus action in Pittsburg County District Court (hereafter, "the 2022 mandamus action").  Dkts. 62-8, 62-9.  The record provided by Cole reflects that on September 30, 2022, an evidentiary hearing was conducted in Pittsburg County District Court, Case No. CV-2022-140.  Dkt. 62-5, at 1.  On October 4, 2022, Pittsburg County District Judge Michael Hogan entered a written order denying Cole's petition for writ of mandamus.  Dkt. 62-4.  Citing *Ford* and § 1005, the state district court reasoned that Cole did not make a "substantial threshold showing of insanity," that Farris thus did not have "good reason to believe" Cole "has become insane," and that Farris therefore did not abuse his discretion in refusing to initiate proceedings pursuant to Okla. Stat. tit. 22, § 1005.  Dkt. 62-4, at 1-4.

Cole then filed a petition for writ of mandamus in the OCCA and moved for a stay of his execution.  Dkts. 62-3, 62-2.  In an order filed October 17, 2022, the OCCA denied the petition and the motion to stay the execution.  Dkt. 62-2.  The OCCA reasoned, in part, that Cole's "competence has been litigated throughout this case," and that "[m]ost of his competence claims concern his lack of communication with counsel or those associated with counsel, his disagreements with counsel, his refusal to assist counsel and his dedication to his religious beliefs."

*Id.* at 8-9.  After detailing the evidence submitted at the hearing and discussing *Ford*, *Panetti*, and

§ 1005, the OCCA concluded that the state district court did not abuse its discretion when it found

that Cole did "not meet the required 'substantial threshold' showing of insanity." *Id.* at 9-16.  The

OCCA reasoned, in relevant part, that "[b]ecause the threshold was not met, the warden did not

abuse his discretion in refusing to make the notification pursuant to Section 1005."  Dkt. 62-2, at

16-17.  The OCCA further stated,

> Reviewing the evidence adduced at the hearing, it is clear that [Cole] while
> exhibiting some peculiar behaviors, completely and rationally understood the
> nature of the proceedings against him, what he was tried for, and that his execution
> was imminent.  [Dr.] Orth, a neutral evaluator selected by the Oklahoma Forensic
> Center to evaluate [Cole], pursuant to the Northern District's order, interviewed
> [Cole] at length in July 2022.  He opined that [Cole] did not suffer from any
> delusions and exhibited no "evidence of substantial, overt signs of mental illness,
> intellectual impairment, and/or neurocognitive impairment that would preclude his
> ability to rationally understand that he is to be executed and that his execution is
> imminent."   Moreover, Orth quoted [Cole] in his report as spontaneously stating
> the following:  "they want to make sure I'm competent, and that I realize first that
> I killed my daughter and I went through a trial for taking my daughter's life and a
> jury found me guilty; they found me guilty of murder and I was given the death
> penalty for that, and I accept responsibility for that."  [Cole] also told Orth he was
> "third on the list [to be executed]" and he believed his execution date was October
> 20, 2022.  Orth had no difficulties in communicating with [Cole].  While [Cole]
> spoke about his religious beliefs during this evaluation, Orth stated those beliefs
> did not affect [Cole's] understanding of his crime, punishment or his impending
> execution.

Dkt. 62-2, at 19-20.  The OCCA also considered the expert reports Cole admitted at the hearing,

and stated,

> The most striking aspect of these reports is that none of them were based upon the
> experts' personal interactions with [Cole].  A recurring theme in these materials is
> tha t[Cole] holds strong religious beliefs and generally refuses to communicate with
> counsel, or anyone associated with counsel.  The first expert, Raphael Morris, M.D.,
> who prepared his initial report prior to the 2015 hearing, diagnosed [Cole] with
> schizophrenia, despite his minimal interaction with him.   Morris admitted,
> however, that "[Cole] was aware of the nature of the proceedings against him, what
> he was tried for, the purpose of his punishment, and his impeding fate."  *Cole*, 2015
> OK CR 13, ¶ 29, 358 P.3d at 939.  In his updated report admitted at this hearing,
> again absent any personal contact with [Cole], Morris's opinion is that he has
> learned nothing about [Cole] which causes him to change his initial opinion.

George Hough, Ph.D., never received cooperation from [Cole] despite numerous attempts to evaluate him beginning in 2016. However, Hough gave his opinion, based upon other records and observations of [Cole], that [Cole] is mentally ill and not competent to be executed. Hough's most recent attempt to evaluate [Cole] occurred in April of 2022. [Cole] refused to leave his cell to speak with Hough or counsel, so the men observed him through an opening in his cell door. Based upon this, Hough reiterated his same opinion about [Cole's] competence, referencing [Cole's] refusal to interact with him as evidence of his incompetence. In [Cole's] prior mandamus proceeding, this Court found [Cole's] refusal to cooperate with these medical professionals and his counsel "appeared to be a choice on his part." *Cole*, 2015 OK CR 13, 358 P.3d at 936.

Yet another expert, radiologist Travis Snyder, D.O., never met with [Cole], but reviewed an MRI scan of [Cole's] brain taken on March 30, 2022. He observed some physical changes in [Cole's] brain which he believes may have worsened [Cole's] alleged schizophrenia. Despite never having met [Cole] or examined him, Snyder opined that the MRI scan supports other opinions that [Cole] is incompetent.

[Cole] attempted to discredit Orth's evaluation by submitting Hough's critique of it. However, the main thrusts of his critique are that Orth's report is based upon a single interview with [Cole], rather than a series, and his skepticism that [Cole] would communicate so freely with Orth. Given the fact that Hough's opinions about [Cole's] competence are based upon not even one interview with him, such a critique is incredible. Moreover, in *Cole*, 2015 OC CR 13, ¶ 12, 358 P.3d at 936, this Court determined that [Cole] was initially willing to speak with his defense team; but after reading a report prepared by Morris during federal habeas proceedings, disparaging [Cole's] beliefs as "primitive coping mechanism," he refused to interact with them. It seems clear that [Cole] viewed Orth, not a member of [Cole's] defense team, but a neutral evaluator, as someone who held no pre-conceived notions about him.

[Cole] has provided no new evidence regarding his competence, other than Orth's report which finds him to be competent to be executed. Based upon the entire record, we find there is not a reasonable probability that [Cole] lacks the competence to be executed. Accordingly, we conclude neither [Farris] nor the District Court abused their discretion in finding [Cole] failed to meet the required "substantial threshold" showing of insanity. [Cole's] Petition for Writ of Mandamus is DENIED. [Cole's] Motion for Stay of Execution is DENIED.

Dkt. 62-2, at 20-23.

## II.    Discussion

In the original petition, Cole claims that because he presently is incompetent to be executed, his execution will violate the Eighth and Fourteenth Amendments, as interpreted in *Ford*

*v. Wainwright*, 477 U.S. 399 (1986), and *Panetti v. Quarterman*, 551 U.S. 930 (2007).  Dkt. 2, at 38.  In the supplemental petition, Cole further claims (1) that his execution will violate the Eighth and Fourteenth Amendments, as interpreted in *Ford* and *Panetti*, because the State of Oklahoma deprived him of procedural due process when it determined he failed to make a substantial threshold showing required by Okla. Stat. tit. 22, § 1005, that would, in turn, require Respondent Jim Farris, the OSP's warden, to initiate further proceedings to determine whether Cole presently is competent to be executed; (2) that Okla. Stat. tit. 22, § 1005 violates the Eighth Amendment, as interpreted in *Ford*, because it "plac[es] the warden in the position of gatekeeper of whether to seek a competency trial"; and (3) that the Oklahoma Department of Corrections' execution protocol violates the Eighth and Fourteenth Amendments because it contains no specific provisions requiring the warden to determine a prisoner's competency to be executed "at the time of his execution."  Dkt. 62, at 18, 35, 42.

Farris urges the Court to deny both petitions because 28 U.S.C. § 2254(d) bars relief as to those claims that Cole fairly presented to the OCCA through the 2022 mandamus action and because 28 U.S.C. § 2254(b)'s exhaustion requirement and the doctrine of procedural default bars relief as to those claims that Cole did not fairly present to the OCCA.

## A. Legal Framework

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) limits a federal court's authority to grant federal habeas relief to state prisoners in three ways that are relevant in this case.  First, a federal court may grant habeas relief to a prisoner in custody pursuant to a state-court judgment "only on the ground that [the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment

susceptible to collateral attack in the federal courts."). Second, a federal court may grant habeas relief only if the prisoner has either (1) exhausted available state-court remedies, 28 U.S.C. § 2254(b)(1)(A), by "fairly present[ing] the substance of his federal habeas claim[s] to state courts," *Hawkins v. Mullin*, 291 F.3d 658, 668 (10th Cir. 2002), or (2) demonstrated a complete absence of available state remedies or an absence of effective state remedies, § 2254(b)(1)(B). Third, a federal court may grant habeas relief to a state prisoner on a federal claim that was adjudicated on the merits in state court only if the prisoner first demonstrates that the state court's adjudication of that claim "resulted in a decision that" either (1) "was contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1), (2) "involved an unreasonable application of clearly established Federal law," *id.* § 2254(d)(1), or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).[5] Federal courts must apply a "highly deferential standard" under 28 U.S.C. § 2254(d), one that "demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 US. 19, 24 (2002) (*per curiam*)). And, when § 2254(d)'s framework applies, the federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181, 185; 28 U.S.C. § 2254(d)(2); *see also Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012) (discussing § 2254 review of state court merits decisions after *Pinholster*).[6]

Moreover, if the state court's decision "'identifies the correct governing legal principle' in

---

[5] As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

[6] As further discussed in the analysis section, Cole either cannot satisfy § 2254(d)'s preconditions to relief or cannot show that his unexhausted claims are properly before the Court. The Court thus denies Cole's request for an evidentiary hearing.

existence at the time," the only question under § 2254(d)(1) is "whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'" *Pinholster*, 563 U.S. at 182 (quoting *Terry Williams*, 529 U.S. at 413). An "unreasonable application of" clearly established federal law under § 2254(d)(1) "must be 'objectively unreasonable,' not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer*, 538 U.S. at 75-76). Thus, to support a claim that the state court unreasonably applied clearly established federal law, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Under § 2254(d)(2), the federal court's focus is on the state court's factual determinations. To show that § 2254(d)(2) does not bar relief, a petitioner must demonstrate that the state court's decision is based on "an unreasonable determination of the facts" that were developed in the state court proceeding. "A state-court decision unreasonably determines the facts if the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim.'" *Wood v. Carpenter*, 907 F.3d 1279, 1289 (10th Cir. 2018) (quoting *Byrd v. Workman*, 645 F.3d 1159, 1170-72 (10th Cir. 2011)). The Supreme Court has "held that under § 2254(d)(2) "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, *Richter*'s "fair-minded disagreement" standard applies when a petitioner alleges a state court decision is based upon on an unreasonable determination of the facts. *Dunn v. Madison*, 138 S. Ct. 9, 11 (2017).

Together, both subsections of § 2254(d) "stop[] short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102. Congress made § 2254(d)'s standards "difficult to meet" for a reason: "to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Id.* at 102-03. In contrast, federal habeas courts provide a forum for state prisoners to obtain relief from "extreme malfunctions in the state criminal justice systems." *Id.* at 102.

### B.    Analysis

### 1.    Substantive and Procedural *Ford* claims

In claim one of his original petition, Cole presents a substantive *Ford* claim, asserting that he presently is incompetent to be executed and, as a result, his execution will violate the Eighth and Fourteenth Amendments, as interpreted in *Ford and Panetti*. Dkt. 2, at 38-51. In claim one of his supplemental petition, Cole presents a procedural *Ford* claim, asserting that the State of Oklahoma deprived him of procedural due process required by the Eighth and Fourteenth Amendments, as interpreted in *Ford* and *Panetti* because, contrary to the OCCA's decision, Cole made a "substantial threshold showing of insanity" sufficient to cause Farris to initiate further proceedings to determine Cole's competency to be executed. Dkt. 62, at 18. In support of both claims, Cole cites expert reports created between 2004 and 2022 and observations of his current and former attorneys, Cole contends he presented evidence to Farris, and to the state courts through the 2022 mandamus action, establishing that Farris had "good reason to believe" that Cole had become insane. Dkt. 2, at 17-38; Dkt. 62, at 19-25. According to Cole, that "[e]vidence from a board-certified psychiatrist, clinical psychologist, and neuroradiologists has established both the nature of Mr. Cole's organic brain disorder and the connection between the disorder and Mr. Cole's mental illness." Dkt. 62, at 19-24. Thus, Cole argues, the OCCA unreasonably applied *Ford* and

15

*Panetti* and unreasonably determined the facts presented in state court when the OCCA concluded that Cole did not make the substantial threshold showing under Okla. Stat. tit. 22, § 1005's "good reason to believe" standard that is necessary to show that Farris should have initiated further proceedings to determine Cole's competency to be executed. *Id.* at 25-35.

Farris does not appear to distinguish between these two claims. Regardless, Farris persuasively argues that the OCCA's decision is neither contrary to nor based on an unreasonable application of *Ford* and *Panetti* and is not based on an unreasonable determination of the facts. Dkt. 64, at 23-34.

### a.   Clearly established federal law

In *Ford*, the Supreme Court held that "[t]he Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane." 477 U.S. at 409-10. Procedurally, a prisoner's sanity to be executed must be judged as to his present mental state when execution is imminent. *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998). Thus, "[p]rior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition." *Panetti*, 551 U.S. at 934. Nonetheless, *Ford* permits states to "presume" that a prisoner is competent to be executed and to require a "substantial threshold showing" of incompetence before the state provides the prisoner an opportunity to be heard on the merits of his claim that he is not competent to be executed. *Ford*, 477 U.S. at 426 (Powell, J., concurring).[7] The *Panetti* Court offered further guidance, stating,

> Under *Ford*, once a prisoner makes the *requisite preliminary showing* that his current mental state would bar his execution, the Eighth Amendment, applicable to the States under the Due Process Clause of the Fourteenth Amendment, entitles him to an adjudication to determine his condition. These determinations are governed

---

[7] As the Supreme Court has already determined, because there was no majority opinion in *Ford*, Justice Powell's concurrence, "which also addressed the question of procedure, offered a more limited holding," and therefore controls. *Panetti*, 551 U.S. at 949.

by the substantive federal baseline for competency set down in *Ford*.

551 U.S. at 934-35 (emphasis added).  Thus, a prisoner must first make the necessary preliminary showing of his incompetency to be executed before he is entitled to any adjudication to determine his condition.  And the prisoner's burden to make a threshold showing is a "high" one.  *Ford*, 477 U.S. at 417.  Further, even when a prisoner satisfies this burden, "a constitutionally acceptable procedure may be far less formal than a trial."  *Panetti*, 551 U.S. at 549.  At a minimum, a prisoner who makes a substantial threshold showing is entitled to "a fair hearing in accord with fundamental fairness" and the "opportunity to be heard."  *Id.* at 949 (quotation marks omitted).

Substantively, the existence of "a psychotic disorder" may provide "[t]he beginning of doubt about competence," *Panetti*, 551 U.S. at 960, but the existence of a mental illness is not determinative of whether a prisoner is incompetent to be executed.  Rather, "[t]he critical question is whether a 'prisoner's mental state is so distorted by a mental illness' that he lacks a 'rational understanding' of 'the State's rationale for [his] execution.'"  *Madison v. Alabama*, 139 S. Ct. 718, 723 (2019) (quoting *Panetti*, 551 U.S. at 958-59).  "Or similarly put, the issue is whether a 'prisoner's concept of reality' is 'so impair[ed]' that he cannot grasp the execution's 'meaning and 'purpose' or the 'link between [his] crime and its punishment.'"  *Id.* (quoting *Panetti*, 551 U.S. at 958, 960).  The *Madison* Court clarified two points from *Panetti*.  First, that the *Panetti* "standard focuses on whether a mental disorder has a particular *effect*:  an inability to rationally understand why the State is seeking execution."  *Madison*, 139 S. Ct. at 728 (emphasis in original).  And, second, that the *Panetti* "standard has no interest in establishing any precise *cause*:  Psychosis or dementia, delusions or overall cognitive decline are all the same under *Panetti*, so long as they produce the requisite lack of comprehension."  *Madison*, 139 S. Ct. at 728 (emphasis in original).

### b.    The OCCA's decision is objectively reasonable

Based on this Court's review of the evidence submitted by the parties and presented to

the state courts, the Court finds, for two reasons, the record does not support Cole's position that it was objectively unreasonable for the OCCA to determine (1) that Cole did not make the substantial threshold showing required to initiate further competency proceedings, and (2) that Cole did not show that his execution will violate the Constitution.

First, as Farris argues, Oklahoma's statutory scheme for determining competency to be executed is consistent with Supreme Court law. Dkt. 64, at 25. As previously noted, *see supra* n.4, the governing statute provides as follows:

> If, after his delivery to the warden for execution, there is good reason to believe that a defendant under judgment of death has become insane, the warden must call such fact to the attention of the district attorney of the county in which the prison is situated, whose duty is to immediately file in the district or superior court of such county a petition stating the conviction and judgment and the fact that the defendant is believed to be insane and asking that the question of his sanity be inquired into. Thereupon, the court must at once cause to be summoned and impaneled from the regular jury list a jury of twelve persons to hear such inquiry.

Okla. Stat. tit. 22, § 1005. And, as this case exemplifies twice over, when the warden communicates his or her opinion that the defendant is competent to be executed, the defendant may file a petition for writ of mandamus in Pittsburg County District Court requesting the court to direct the warden to act. In addition, should the state district court deny mandamus relief, the defendant may file a mandamus appeal in the OCCA. The OCCA then independently determines the existence of "good reason to believe" that the defendant has become insane. As just discussed, *Ford* permits states to presume that a prisoner sentence to death is competent to be executed unless that prisoner makes a preliminary showing to rebut that presumption. In Oklahoma, the prisoner the prisoner must show "there is good reason to believe" the prisoner is not competent to be executed before the prisoner is provided an opportunity to be heard by a jury on the issue. Here, Farris did not find good reason to believe that Cole is incompetent, Cole moved for mandamus relief in the state district court, and the state district court held an evidentiary hearing to determine

18

whether Cole did, in fact, make a substantial threshold showing to obtain a jury trial.  Neither *Ford* nor any other Supreme Court precedent requires more due process than Cole received.

Second, the Court finds that fairminded jurists would not disagree with the OCCA's factual or legal determinations that Cole has not shown that he presently is incompetent to be executed. Cole argues that the OCCA unreasonably applied *Ford* and *Panetti*, as a matter of law, "by holding [him] to a more rigorous standard than the 'substantial threshold' standard, by failing to adequately consider whether Dr. Orth's report establishes that Cole has a rational understanding of the State's rationale for his punishment, and by failing to adequately consider whether Cole's "peculiar behaviors" preclude his rational understanding of the State's rationale for his punishment.  Dkt. 62, at 28-30.  It is not entirely clear whether these arguments focus solely on the substantive *Ford* claim or extend to both claims.  In either situation, the record supports the objective reasonableness of the OCCA's application of *Ford* and *Panetti* to the facts of this case.  As the OCCA reasoned, from the time a jury found Cole competent to stand trial to the present time, Cole has consistently been uncooperative with his own attorneys and mental health professionals.  Dkt. 62-2, at 18-23. As recognized by United States District Judge Claire V. Eagan in her Opinion and Order denying Cole's first petition for writ of habeas corpus, "Cole's decision regarding how much he communicated with counsel is clearly reflected in the record to be a choice and not an inability." *Cole*, 2011 WL 3862143, at *20.  Furthermore, as reflected by evidence presented in the state mandamus proceedings, and thoroughly discussed by the OCCA in its order, Cole's recent interactions with prison officials and Dr. Orth demonstrate that he has a rational understanding of the State's rationale for his execution.  Dkt. 62-2, at 18-23.

Third, the Court does not find persuasive Cole's argument that the OCCA's decision to deny mandamus relief rests on an unreasonable determination of the facts.  Dkt. 62, at 30.  Cole

contends the OCCA unreasonably determined that he "provided no new evidence regarding his competence." Dkt. 62, at 30 (citing Dkt. 62-2, at 23). To be fair, the OCCA did state, "Petitioner has provided no new evidence regarding his competence, other than Orth's report which finds him to be competent to be executed." Dkt. 62-2, at 23. This could be construed as a misstatement of the record. Cole did present recent reports from Dr. Snyder and Dr. Hough regarding their assessments or attempts to assess Cole's competence between 2016 and 2022. Substantively though, the OCCA's statement is apt. As the OCCA reasoned, this "new" evidence was essentially more of the same evidence presented to the OCCA in the 2015 mandamus action. Dkt. 62-2, at 20-23. More importantly, the OCCA's statement followed its thorough consideration of all evidence presented. To the extent Cole argues the OCCA misstated the record, that misstatement was not material to its adjudication of Cole's claims.[8]

Based on the foregoing, Cole has not shown that the OCCA's denial of mandamus relief was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). The Court therefore denies the petition for writ of habeas corpus as to the substantive *Ford* claim asserted as claim one in the original petition and the procedural *Ford* claim asserted as claim one in the supplemental petition.

### 2.    Constitutionality of Okla. Stat. tit. 22, § 1005

Next, Cole claims that Oklahoma's "current execution competency mechanisms are

---

[8] Cole's remaining arguments regarding the OCCA's alleged misstatements or misunderstanding of the facts seem to focus, in large part, on errors allegedly made by the warden or the state district court. Dkt. 62, at 30-35. But, only the OCCA's decision is subject to federal habeas review. Having considered Cole's additional arguments, the Court finds them unpersuasive. Dkt. 62, at 30-35.

unconstitutional." Dkt. 62, at 35. More specifically, he argues that Okla. Stat. tit. 22, § 1005 violates the Constitution, as interpreted in *Ford*, by "[p]lacing the warden in the position of gatekeeper of whether to seek a competency trial" when the warden "is not only an executive officer, but also the executioner." *Id.* at 35-40.

The OCCA rejected this claim, stating,

> This Court recognizes the propriety of the procedure under Section 1005 and the adequacy of mandamus review on the issue of competence to be executed. In *Allen*, 2011 OK CR 31, ¶ 9, 265 P.3d at 756-57, we expressly determined that "Oklahoma's procedure on its face complies with the federal constitution." The Tenth Circuit Court of Appeals has also recognized the adequacy of Oklahoma's procedure in this regard, albeit in unpublished opinions. *See Ochoa v. Trammell*, 504 F. App'x 705, 709 (10th Cir. Dec. 3, 2012) (unpublished) (citing *Allen v. Workman* and finding it persuasive in denying Ochoa's' identical challenge); *Allen v. Workman*, 500 F. App'x 708, 710-12 (10th Cir. Oct. 8, 2012) (unpublished) (the warden's role as "gatekeeper" does not violate due process). As Petitioner has not presented any authority that our decision in *Allen* was wrongly decided we see no reason to depart from our prior holding. Petitioner's challenge to the procedure for handling competency to be executed claims is denied.

Dkt. 62-2, at 15-16.

Farris contends § 2254(d) bars this claim because the OCCA's rejection of it is objectively reasonable. Dkt. 64, at 35-42. The Court agrees. *Ford* expressed concern when a state law designated an official in the executive branch, namely, the Governor, as the sole gatekeeper for competency to be executed claims. 477 U.S. at 412. As the OCCA and the Tenth Circuit have reasoned, Oklahoma law does not implicate the same concern because the warden acts as the initial gatekeeper and his or her decision is subject to judicial review through state mandamus proceedings and, as here, through federal habeas proceedings. This Court has previously found the Tenth Circuit's unpublished decisions on this point persuasive, *see* Dkt. 11, and finds no reason to reconsider that decision.

In addition to his gatekeeper-argument, Cole contends § 1005 is unconstitutional because several states, including Oklahoma, have recently revised their statutes governing competency to

be executed procedures.  Dkt. 62, at 35-40.  He also argues that executing him only 11 days before the governing statute takes effect "is impermissibly arbitrary."  Dkt. 62, at 39.  But, as Farris points out, Cole did not fairly present these arguments to the OCCA.  Dkt. 64, at 41-42.  *See Grant v. Royal*, 886 F.3d 874, 890-92 (10th Cir. 2018) (discussing exhaustion requirement and noting that a habeas "petitioner cannot assert entirely different arguments [in his or her request for habeas relief] from those raised before the state court" (quoting *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006))).[9]

In sum, § 2254(d) bars relief on this claim, as it was presented to the OCCA, and § 2254(b)(1)(A) bars relief as to those portions of the claim that were not presented to the OCCA. The Court therefore denies the supplemental petition as to claim two.

### 3.    Constitutionality of ODOC Execution Procedure

Lastly, Cole claims the Oklahoma Department of Corrections' execution procedure, set forth in the ODOC's Operational Policy OP-040301, violates the Eight Amendment because "it contain[s] no procedural safeguards or mechanisms by which the State will ensure that a condemned inmate whose execution is imminent is not incompetent to be executed."  Dkt. 62, at 41.  Cole appears to argue that the Eighth and Fourteenth Amendments require a state to have a specific procedure in place for prison officials to determine whether a prisoner is competent to be executed "at the time of his execution."  *Id.* at 42-47.  According to Cole, this creates a risk that

---

[9] In his reply to the response to the supplemental petition, Cole suggests he exhausted his argument that executing him shortly before the amended version of § 1005 becomes effective would be impermissibly arbitrary.  Dkt. 69, at 8.  Specifically, he cites his statement, in his brief in support of the mandamus petition, asserting that Oklahoma recognized a constitutional defect in the statute and remedied it by enacting a new law that will go into effect on November 1, 2022.  Dkt. 69, at 8.  But making an assertion is not the same as making an argument.  The Court is not persuaded that asserting a constitutional defect and observing the date of a revised statute gave the OCCA fair notice of the argument Cole now presents in the supplemental petition.

the warden will "execute Mr. Cole when he is categorically exempt from execution." *Id.* at 42.

This claim bears little discussion because, as Farris argues, Cole did not fairly present this claim, in any form, to the OCCA. Dkt. 64, at 42. And, as just discussed, nothing in the supplemental petition, and nothing in Cole's reply to the response to the supplemental petition, demonstrates that this unexhausted claim is properly before the Court in this proceeding. *Grant*, 886 F.3d at 890-92. The Court therefore denies the supplemental petition as to claim three.

### C.    Conclusion

Based on the foregoing analysis, the Court concludes that Cole is not entitled to federal habeas relief as to any claims raised in the original or supplemental petitions. The Court therefore denies both petitions and denies as moot Cole's emergency motion for a stay of execution.

## III.    Certificate of Appealability

As a final matter, the Court must consider whether to issue a certificate of appealability. Rule 11, *Rules Governing Section 2254 Cases in the United States District Courts*, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing." A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).

After considering the extensive record in this case, the Court declines to issue a certificate of appealability because nothing suggests that the Tenth Circuit would find that this Court's application of AEDPA standards to the OCCA's decision is debatable amongst jurists of reason.

*See Dockins v. Hines*, 374 F.3d 935, 937-38 (10th Cir. 2004).

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. Cole's request for an evidentiary hearing is **denied**.

2. The petition for writ of habeas corpus (Dkt. 2) is **denied**.

3. The supplemental petition for writ of habeas corpus (Dkt. 62) is **denied**.

4. A certificate of appealability is **denied**.

5. The emergency motion for stay of execution (Dkt. 63) is **denied as moot**.

6. A separate judgment shall be entered in this matter.

**DATED** this 19th day of October 2022.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE